# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| CHRISTINA CARMACK WHEELER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:16-cv-03141 |
| ) | CHIEF JUDGE CRENSHAW |
| SAGA COMMUNICATION OF ) | |
| TUCKESSEE, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Christina Wheeler, a former on-air personality for the radio broadcasting company Saga Communication of Tuckessee, LLC ("Saga"), brought this employment action against her former employer alleging (1) gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) et seq., the Equal Pay Act, 29 U.S.C. § 206(d)(1), and the Tennessee Human Rights Act ("THRA"), Tennessee Code Annotated § 4-21-401(a) and (2) retaliation, in violation of Title VII, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), the THRA, and the Tennessee Public Protection Act, Tennessee Code Annotated § 50-1-304. (Doc. No. 25.) Before the Court is Saga's Motion for Summary Judgment. (Doc. No. 33.) For the following reasons, Saga's Motion is denied.

I.     UNDISPUTED FACTS[1]

Saga operates seven radio stations in Clarksville, Tennessee. (Doc. No. 40 at 1.) Three of the radio stations are at issue here: "Beaver 100.3" is the largest-watt radio station, generating the

---

[1] There are drastic differences in the testimony of what occurred in the last three months of Wheeler's employment, up to and including what occurred at the meeting on the date of her termination. For the purposes of this Opinion, all facts supported by evidence will be construed in the light most favorable to Wheeler.

most revenue, "Q108" is the second-largest radio station, and "Rewind 94.3" is one of the smaller stations. (Id. at 2.) The on-air personalities that worked the "Morning Drive" shift, from 5:00 a.m. to 9:00 a.m., were generally paid the highest because they had the most listeners, while the personalities that worked the "Afternoon Drive," from 2:00 p.m. until 7:00 p.m., were generally paid the second-highest. (Doc. No. 36-2 at 35-36.) There is no other proof in the Statement of Undisputed Facts (Doc. Nos. 40, 42) about amounts other shifts or radio stations paid.

A. Wheeler's Employment With Saga

Saga hired Wheeler in 2007 as a full time on-air personality with an annual salary of $22,000. (Doc. No. 42 at 3.) This was the lowest salary for any on-air personality at that time. (Id. at 3.) She signed a 12-month contract each year from 2007 until 2015. (Doc. No. 36-2 at 41.) For the 2015 calendar year, Saga and Wheeler agreed that Wheeler would receive a $24,000 salary (Doc. No. 40 at 3; Doc. No. 36-3), although Saga's records indicate that it paid Wheeler an annual salary of $31,876. (Doc. No. 36-8 at 2.) Either of these salaries would have been the lowest of all on-air personalities at that time.[2] (Id.) That year, Wheeler worked as an "on-air personality" for the 9:00 a.m.-2:00 p.m. shift for Q108, and the Afternoon Drive shift on Rewind 94.3. (Doc. No. 40 at 2-3.) She also worked weekend shifts on both station. (Id. at 3.)

At some point, Wheeler inadvertently saw documentation that another on-air personality, Nicholas Fox, had an annual salary of $36,000 per year. (Doc. No. 42 at 4.) Wheeler believed she was not paid enough money, and began looking for other employment opportunities in November 2015. (Doc. No. 40 at 4; Doc. No. 36-2 at 51.) Around that time, Saga, through Wheeler's supervisor Jason Giardina, presented her with a contract for the 2016 calendar year with a salary

---

[2] Although three men were paid lower total salaries for the calendar year 2015, those three men only worked part of the year. When calculating their monthly salaries, Saga still paid Wheeler the least on an annual basis. (Doc. No. 36-8 at 2.)

2

of $24,000. (Doc. No. 38-3 at 10-11.) Wheeler indicated that she was hesitant to sign the contract because Saga was paying her less than her male counterparts. (Doc. No. 36-2 at 44.)[3] A few days later, Giardina agreed with Wheeler that she was paid significantly less than the male on-air personalities. (Doc. No. 25 at 5; Doc. No. 36-2 at 75 (affirming that Giardina made the statement in Paragraph 36 of the original Complaint, which is paragraph 38 in the Amended Complaint)). Giardina told Wheeler that it would be great if she could make more money because he was surprised about how little she was making. (Doc. No. 36-4 at 11; Doc. No. 42 at 8.) Giardina stated that he would convey Wheeler's complaints to Katie Gambill, Giardina's superior. (Doc. No. 36-2 at 70.)

On November 30, 2015, Wheeler sent Giardina an email that she needed more time to decide whether to sign her 2016 offer of employment so that she could explore other employment opportunities. (Doc. No. 40 at 4; Doc. No. 36-1 at 16.) Giardina informed Gambill, who instructed him to give Wheeler until December 11, 2015, to consider her options. (Doc. No. 40 at 4; Doc. No. 36-1 at 16.) In December 2015, Giardina asked Wheeler if she was ready to sign the 2016 contract, to which Wheeler stated she was not because she was expecting another job offer that would be more lucrative. (Doc. No. 40 at 5; Doc. No. 36-4 at 9.) Giardina reported the update regarding Wheeler to Gambill, who then authorized Giardina to offer Wheeler a temporary 30-day contract that would allow her to stay at Saga through January 2016. (Doc. No. 40 at 5; Doc. No. 38-1 at 13; Doc. No. 38-2 at 16.) Giardina then provided Wheeler with a temporary 30-day contract, which she signed. (Doc. No. 36-2 at 51-52.)

On January 11, 2016, Wheeler met with Giardina and Gambill. (Doc. No. 40 at 5.) Gambill immediately stated that Wheeler was not going to be getting any more money and "there is no

---

[3] It is unclear from the Statement of Undisputed Facts and cited portions of the record if these conversations took place in November or December 2015. This distinction is immaterial for the purposes of summary judgment.

discussion to be had about that." (Doc. No. 36-2 at 79-80.) At the meeting, Wheeler indicated that she was willing to sign the contract, but she would ask Gambill to release Wheeler from her contract if she received a better offer during the year. (Id. at 80-82.) At that point, Gambill stated, "I'm not going to renew your contract. I'm going to give you the gift of freedom to pursue another opportunity where you won't feel that you're being discriminated against." (Id. at 82.) Wheeler indicated that she was disappointed that her pay was lower than her male counterparts after being with the company for nine years and that Gambill chose to treat her poorly when raising the issue. (Id. at 83.)

B. Proposed Comparators at Saga

Wheeler compares herself to male on-air personalities Fox and David Meyers. (Doc. No. 42 at 4-6.) As stated previously, Fox made $36,000 per year in salary, while Myers earned $30,000 per year in salary. (Id. at 4-5.) It is unclear from the cited portions of the record what constituted either Fox's or Meyers' radio experience at the time Saga hired them. Saga originally hired Meyers to be an on-air personality on the afternoon shift of Beaver 100.3. (Id. at 5.) Until he was promoted to become a morning host, replacing Fox, Myers had no additional responsibilities as compared to Wheeler. (Doc. No. 36-1 at 21.)

II. ANALYSIS

Saga moves for summary judgment on Wheeler's state law claims as time-barred by the employment contract. (Doc. No. 34 at 12.) It also moves for summary judgment on the gender discrimination claims because it argues Wheeler does not establish there were any similarly-situated male counterparts. (Id. at 16.) Finally, Saga moves for summary judgment on Wheeler's retaliation claims because it argues Wheeler cannot prove causation. (Id. at 19.)

4

In reviewing a motion for summary judgment, the Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the "inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion," in this case, Wheeler. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The nonmoving party then has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" Matsushita, 475 U.S, at 587. If the evidence offered by the nonmoving party is "merely colorable," "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

A. Contractual Limitations Period for State Law Claims

Saga argues that the state law claims are time-barred, not by the Tennessee statute, but instead by the contract. (Doc. No. 34 at 12.) Indeed, Counts 3, 4, and 5 of the Amended Complaint allege violations of the THRA and the TPPA, both which have a one-year statute of limitations. Tenn. Code Ann. §§ 50-1-304 and 4-21-311. Because Wheeler was terminated in January 2016

and she filed the original Complaint in this action in December 2016, the claims would be timely under Tennessee law.

However, Wheeler's employment contract for the year 2015 states:

> Employee agrees not to commence any action which in any way relates to his/her employment and/or termination of employment including any administrative claim or lawsuit, against Employer and/or its agents or employees, more than six months after the date of the event giving rise to said action(s) and Employee hereby knowingly and voluntarily waives any statutes of limitations to the contrary.

(Doc. No. 36-3 at 8.) Wheeler concedes that, for the purposes of this case, Tennessee law allows contracts to limit the period in which an employee may bring a THRA action. (See Doc. No. 38 at 6-7 (not disputing the law)); see also Bullard v. Fedex Freight, Inc., 218 F. Supp. 3d 608, 614 n.2 (M.D. Tenn. 2016) (recognizing Tennessee law allows employers to contractually limit employee's time frame to bring an action under the THRA) (quoting Hill v. Home Ins. Co., 125 S.W.2d 189, 192 (1938)). Wheeler filed the original Complaint eleven months after her termination, so if the 2015 contract were in place when she was terminated, Wheeler's THRA claims would be contractually time-barred.

Additionally, the TPPA is governed by Tennessee's one-year general statute of limitations. Wade v. Knoxville Utils. Bd., 259 F.3d 452, 460 (6th Cir. 2001) (citing Weber v. Moses, 938 S.W.2d 387, 393 (Tenn. 1996)). However, the Tennessee Court of Appeals has allowed employers to contractually limit employees' time to bring TPPA actions. Skaan v. Fed. Exp. Corp., No. W2011-01807-COA-R3-CV, 2012 WL 6212891, at *9 (Tenn. Ct. App. Dec. 13, 2012). The Court of Appeals held that the contractual limitations period is "part of the terms on which [the employer] would consider hiring [the employee], . . . and [the employer] hired [the employee] based on his execution of the Employment Agreement." Id. Here, Saga and Wheeler signed the 2015 employment contract reducing Wheeler's time period to bring suit to sixth months after the

alleged-retaliatory act. Because Tennessee would uphold that provision, Wheeler's TPPA claim would likewise be contractually time-barred if the 2015 contract were in place at the time of Wheeler's termination.

Here, however, there is a dispute of material fact on whether the 2015 contract was in effect at the time of Wheeler's termination. If the 2015 contract was simply extended for one month in January 2016, as Saga argues, that "extended" contract would be the governing contract at the time of the alleged retaliation, and the state law claims would be contractually time-barred. However, if the parties executed a *separate* 30-day contract for January 2016, as Wheeler testified, there is no evidence in the record regarding whether the same contractual limitations period existed. The Court will allow the factfinder to determine whether there is a separate 2016 contract, and if so, the Court will decide as a matter of law the effect of the THRA gender discrimination claim arising in 2015.[4]

B. Gender Discrimination

Saga moves for summary judgment on the substance of Wheeler's gender discrimination claims. Its sole argument is that Wheeler does not prove that she was treated differently than any similarly-situated male employee. (Doc. No. 34 at 15-19.) Wheeler argues that Fox and Meyers were similarly situated to her but paid more. (Doc. No. 38 at 7-11.)

The Court analyzes Wheeler's Title VII, Equal Pay Act, and THRA gender discrimination claims under the same standard. Odomes v. Nucare, Inc., 653 F.2d 246, 250 (6th Cir. 1981); Payne v. Goodman Mfg. Co., L.P., 726 F. Supp. 2d 891, 910 (E.D. Tenn. 2010) (analyzing THRA and

---

[4] The Court notes that the practical effect of this is minimal, if any. Wheeler can recover above Title VII's statutory cap under the Equal Pay Act, 29 U.S.C. § 216(c), and the THRA would not allow for any punitive damages available under Title VII. See Summit Constructors, Inc., 788 F. Supp. 2d 703, 723 (M.D. Tenn. 2011) (noting that punitive damages are not available under the THRA but are available under Title VII, and amount of damages available under Title VII are capped as set forth in 42 U.S.C. § 1981a(b)(2)).

7

Equal Pay Act claims under the same standard); Tolliver v. Children's Home-Chambliss Shelter, 784 F. Supp. 2d 893, 903-04 (E.D. Tenn. 2011) (analyzing the Equal Pay Act and Title VII claims using the same standard). For Wheeler to establish that she performed equal work for unequal pay, she has the burden to prove that Saga "pays different wages to employees of opposite sexes for equal work on the jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Veher v. Cole Nat'l Grp., Inc., 251 F. App'x 993, 998 (6th Cir. 2007) (quoting EEOC v. Romeo Cmty. Schs., 976 F.2d 985, 987 (6th Cir. 1992)).

Here, it is undisputed that at least Meyers performed the same work as Wheeler when he worked the afternoon shift for Beaver 100.3, yet he had a higher salary. That Beaver 100.3 is a larger station is of no consequence because there is no evidence in the record that the radio personalities at the different stations get paid differently. Instead, the only evidence in the record is that the radio personalities that work the afternoon drive are generally paid the second-highest. (Doc. No. 36-2 at 35-36.) Yet Wheeler, working the afternoon shift, was paid the lowest of all the on-air radio personalities. Wheeler established her prima facie case.

The burden then shifts to Saga to prove one of four affirmative defenses to justify the wage differential: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality production; or (4) any other factor other than sex." 29 U.S.C. § 206(d)(1). Saga does not raise any affirmative defense in its Memorandum in Support of the Motion for Summary Judgment. (Doc. No. 34 at 19.) In its reply brief, Saga argues that it established an affirmative defense, but does not identify which one. (Doc. No. 41 at 2-4.) There are two issues with Saga's argument. First, a reply brief is too late to raise an affirmative defense because Wheeler has no chance to refute it. See Osborne v. Hartford Life and Acc. Ins. Co., 465 F.3d 296, 301 (6th Cir.

2006) ("We ordinarily do not entertain an argument first made in a reply brief.") (citing Radvansky v. City of Olmsted Falls, 395 F.3d 291, 318 (6th Cir. 2005)). Moreover, Saga's purported affirmative defense relies on an issue of fact in that it claims Wheeler pre-recorded her show. (Doc. No. 41 at 4.) However, Wheeler testified that her show was live, not pre-recorded. (Doc. No. 36-2 at 75.) Any argument that Wheeler had less responsibility because she had a pre-recorded show is not reading the facts in the light most favorable to Wheeler, making summary judgment inappropriate.

C. Retaliatory Discharge

Saga also moves for summary judgment on Wheeler's retaliatory discharge claims. Title VII and FLSA retaliation claims are analyzed under the same legal framework. Mansfield v. City of Murfreesboro, 706 F. App'x 231, 235 (6th Cir. 2017). The Court may also analyze THRA retaliation claims under the same standard. Hajizadeh v. Vanderbilt Univ., 879 F. Supp. 2d 910 (M.D. Tenn. 2012). To prove retaliatory discharge using circumstantial evidence under Title VII, the FLSA, and the THRA, a plaintiff must prove (1) she engaged in protected activity; (2) the defendant knew about her protected activity; (3) the defendant took an adverse action against the plaintiff; and (4) a causal connection existed between the protected activity and the adverse action. Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (citing Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007)). The fourth element is only proven if the plaintiff can show "but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)).

To prove retaliatory discharge in violation of the TPPA, a plaintiff must prove: (1) she was an employee of the defendant; (2) she refused to participate in or remain silent about illegal

9

activity; (3) the defendant terminated the plaintiff's employment; and (4) the plaintiff's refusal to participate in or remain silent about illegal activity was the sole cause of her termination. Williams v. City of Burns, 465 S.W.3d 96, 111 (Tenn. 2015) (citing Sykes v. Chattanooga Housing Authority, 343 S.W.3d 18, 26-27 (Tenn. 2011)).

Under any of these laws, Saga only contests whether Wheeler can prove causation. Saga argues that Wheeler cannot prove causation because it did not terminate Wheeler's employment for complaining about gender discrimination, but instead for stating that she would not honor her twelve-month contract if she receives a more lucrative offer. However, a reasonable jury could find that Wheeler's statement that she would consider other offers was part of her protected activity demanding equal pay for equal work—that is, she only stated she would consider other offers because she was being paid less than men and felt discriminated against. In other words, Wheeler's protected activity consisted of demanding equal pay for equal work, and that she threatened to leave if Saga did not stop discriminating against her is part of Wheeler's protected activity. The fact that Saga admits that this is the reason it terminated Wheeler's employment shows that a reasonable jury could find that Wheeler's protected activity was either the "but-for" or sole cause of her termination.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE